UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**                                                   **Case No:  6:10-cv-1873-Orl-41DAB**

**DAVID LEE MINER,**

**Defendant.**

_____/

## ORDER AND INJUNCTION

THIS CAUSE is before the Court on a Motion for Summary Judgment (Doc. 56) filed by

the United States on June 3, 2014. In its Complaint (Doc. 1), the United States seeks injunctive

relief pursuant to 26 U.S.C. §§ 7402 and 7408, restraining Defendant from promoting false tax

schemes. As set forth below, the United States' Motion for Summary Judgment will be granted

and a permanent injunction entered.

### I.    BACKGROUND

Defendant, who pursued a Bachelor's degree in biology, (Miner Criminal Trial Tr. ("Crim.

Tr."), Doc. 58-1, at 1407:21–1408:25[1]), holds himself out as financial advisor and tax expert, (*see*

United States' First Set of Reqs. for Admis. & Def.'s Answers (collectively "U.S. RFA"), Doc.

58-7, admissions 3–22 (describing Defendant's tax advice publications); Crim. Tr. at 1410:14–

25). Defendant claims to have spent hundreds of hours in law libraries studying the Internal

Revenue laws and applicable caselaw, (Crim. Tr. at 749:19–24, 1431:7–17, 1451:17–1452:7,

---

[1] Portions of the Transcript from Defendant's Criminal trial, spanning multiple days with non-consecutive original page numbers, have been filed together at Docket Entry 58-1. For ease of reference, the Court will cite to the "PageID" numbers provided in the electronic filing.

1477:3–9), and in his publications, Defendant provides numerous citations to statutes, regulations, and cases, (*see, e.g.*, *Tax Answers [t]he IRS Doesn't Want You to Have* ("*Tax Answers*"), Doc. 58-8, at 2–5, 8–9, 39–43; *see generally*, Myslwski Req. to Correct Permanent Records & Mem. of Law in Support, Doc. Nos. 58-28, 58-29, 58-30, 58-31). Based on his purported study of tax law, Defendant stopped filing income tax returns in tax-year 1990. (Crim. Tr. at 1423:6–7). Shortly thereafter, Defendant began sharing his methods for tax evasion with others.

In 1995, Defendant wrote and disseminated the first version of his publication, *Tax Answers [t]he IRS Doesn't Want You to Have*, which he later updated and continued to distribute. (*Id.* at 1451:6–15, 1290:19–25). In this seventy-seven-page manifesto, Defendant purports to "inform the individual American Citizen of his/her rights . . . [and] to help the Citizen know what the [Internal Revenue Service ("IRS")] can and cannot do." (*Tax Answers* at iv). Defendant actually provides misleading legal analysis, advising the reader that "there are no provisions in the [Internal Revenue Code] which specifically require individuals (you and me) to pay income taxes!" (*Id.* at 29 (emphasis omitted)). In addition, Defendant provides a list of recommended resources, which includes references to organizations and publications founded and written by individuals who have been criminally convicted and civilly enjoined in connection with their federal income tax schemes. (*Id.* at 61 (recommending, *inter alia*, The Research Foundation, founded by LaMarr Hardy; SAP fellowship, founded by John Kotmair, Jr.; *Good News for the Form 1040 Filer, Bad News for the IRS!*, a book by Joseph Sweet; and *The Great Income Tax Hoax*, a book by Irwin Schiff); Second Superseding Indictment of LaMarr Hardy, Doc. 58-11; Criminal J. against LaMarr Hardy, Doc. 58-13; Order of Permanent Inj. against John Kotmair, Doc. 58-15; Indictment against Joseph Sweet, Doc. 58-3; Criminal J. against Joseph Sweet, Doc. 58-6; Order of Inj. against Joseph Sweet, Doc. 58-2; Indictment of Irwin Schiff, Doc. 58-19; Criminal J. against Irwin Schiff, Doc.

58-21; Order of Permanent Inj. against Irwin Schiff, Doc. 58-18). One of these individuals, Joseph Sweet, was an associate of Defendant and introduced Defendant to many of the concepts that serve as the basis for his programs. (Crim. Tr. at 1428:10–25, 1431:4–20). Defendant maintained contact with Mr. Sweet and at one point, contemplated a joint business venture. (*Id.* at 1458:4–20).

In addition to publishing *Tax Answers*, Defendant created two entities to further his business of assisting others in tax evasion: IRx Solutions and Blue Ridge Group. (*Id.* at 1070:1–6, 1481:23–1482:6, 1458:21–1459:11). Defendant created a website, IRxsolutions.com, where he advertised his services and maintained purported tax advice documents that he wrote including: "One Problem – One Solution"; "An Introduction to the so-called federal Income Tax and Why Some Claim they Don't Have to Pay It"; "Description of the Individual Master File Resolution Program"; and "Master File – What Secret IRS File Subjects You To Anything the IRS Wants To Do To You And How To Change All That?" (U.S. RFA, admissions 3–9; Exs. A & B to U.S. RFA). Defendant also spoke at seminars, touting his programs and recruiting clients. (Crim. Tr. at 1463:20–24). As Defendant's business grew, he hired at least a six associates, each of whom Defendant personally trained. (*Id.* at 1484:16–1488:23).

As a part of this business, Defendant ran two tax-related programs—the IMF program and "Unincorporated Business Trust Organizations" ("UBTO") program. Pursuant to the IMF program, which Defendant began in approximately 2002, (*id.* at 1477:18–22), Defendant would "assist [clients] through the process of obtaining [their] Individual Master File and other personal files the IRS [keeps] on [them]" and then "decoding" and "correcting" those files. (Welcome to the IRx Solutions IMF Program ("IRx Welcome Letter"), Doc. 58-22, at USAO_6418; Crim. Tr. at 662:6–23, 722:2–723:3, 883:1–7). As part of this program, Defendant inaccurately advised his clients that "[t]here is no section of the Internal Revenue Code or its enabling regulations that

requires . . . an individual American NOT involved in a revenue-taxable activity[] to file a Form 1040 or pay income taxes." (IRx Welcome Letter at USAO_6419; Description of the Individual Master File Resolution Program ("IMF Description"), Ex. B to U.S. RFA, at IRSADMIN000086). Defendant claims that only businesses, rather than individuals, are required to pay income tax and further asserts that the IRS erroneously classifies individuals as businesses in order to illegally require those individuals to pay income tax. (IMF Description at IRSADMIN000086; Crim. Tr. at 722:2–15). According to Defendant, if an individual corrects the inaccuracies in his IMF, the individual will "drop off the [IRS's] radar" and will no longer be required to file income tax returns or pay taxes. (Crim. Tr. 722:16–21).

In order to effectuate the IMF program, Defendant drafts Freedom of Information Act ("FOIA") requests on behalf of his clients, which they send to the IRS in an effort to obtain their IMF and other records. (*Id.* at 663:16–21, 684:3–9, 722:22–723:3, 724:17–725:12, 1478:18–24). Defendant also drafts other communications to the IRS for his clients, including responses to collection efforts by the IRS. (IMF Description at IRSADMIN000086–87). Many of these responses drafted by Defendant threaten legal action against the IRS and individual IRS employees. (Crim. Tr. at 762:3–13, 841:7–842:22, 850:18–851:24, 892:1–893:16). In the meantime, Defendant advises his clients to change their withholding status to "exempt" so that no taxes are withheld from their paychecks. (*Id.* at 756:17–757:7). Defendant charged his clients between $1,200 and $1,800 for the IMF program. (IMF Description at IRSADMIN000088; Crim. Tr. at 663:22–664:1, 691:19–21, 987:19–25).

In addition to the IMF program, Defendant assisted clients in setting up UBTOs or "Business Trusts."[2] Defendant specifically notes that these entities are not based in statute but, according to Defendant, are created under the authority of "the Constitution for the United States of America by Common Law Right of Contract." (UBTO Instructions, Doc. 58-48, at USAO_007409). Defendant directed clients that they could set up UBTOs, place their personal assets into the trust, maintain full access to those personal assets, and yet pay no taxes on those assets. (Crim. Tr. at 1006:1–25, 879:13–20). The purpose for the creation of these trusts was the express avoidance of paying income taxes. (*Id.* at 807:10–20; 893:19–25; 896:2–7).

Along with drafting and providing the trust documentation, Defendant advised clients that they should obtain an Employer Identification Number ("EIN"). (*Id.* at 1009:23–1010:9). The purpose of obtaining an EIN was to allow clients to divert personal income into the trust then receive compensation from said trust as independent contractors with no withholdings. (*Id.*). In addition, Defendant advised clients how to use the EIN to open a bank account without providing a social security number so that the IRS could not identify the assets as belonging to those individuals and therefore, could not levy taxes on the income and assets in the trust. (Directions for Opening a Bank Account, Doc. 58-51, at USAO_6394–96). Defendant's clients paid him approximately $2,000 to set up a UBTO. (Crim. Tr. at 807:23–25).

Defendant's programs caused significant harm both to the IRS and to the individuals he was purporting to help. For example, Dr. Hans Himmel contacted Defendant because he was unable to resolve legal issues he was experiencing with the IRS. (*Id.* at 688:8–24, 704:19–25, 710:16–20). Defendant told Dr. Himmel that the tax system was illegal and claimed that he could

---

[2] These entities are also referred to as "pure trusts," "common law trusts" and "Massachusetts trusts."

make Dr. Himmel "[i]nvisible to the IRS" via the IMF program. (*Id.* at 689:13–690:24). Dr. Himmel purchased Defendant's services, but rather than helping Dr. Himmel with his existing problem, Defendant caused the situation to worsen and delayed a resolution with the IRS. (*Id.* at 710:4–10). Roger McGee, who also purchased Defendant's IMF program, was later charged with, and pleaded guilty to, two counts of failure to file income tax returns. (*Id.* at 721:3–18, 727:19–728:10). Other clients paid more in taxes and penalties as a direct consequence of following Defendant's advice. (*See, e.g.*, *id.* at 1005:4–12). The impact of Defendants advice affected clients' lives and businesses beyond mere financial losses. (*See, e.g.*, *id.* at 818:9–24).

As a result of his schemes, Defendant was convicted of one count of corruptly endeavoring to obstruct or impede due administration of the Internal Revenue Code in violation of 26 U.S.C. § 7212, and two counts of failing to file a tax return in violation of 26 U.S.C. § 7203. (Miner Superseding Indictment, Doc. 58-55; Miner Criminal J., Doc. 58-58). During the investigation, the United States uncovered 175 client files Defendant had in his possession at the time the warrant was executed. (Crim. Tr. at 1287:11–15, 1291:1–12). However, Defendant boasted on his web site that he "helped" over two thousand clients. (*One Problem – One Solution*, Ex. A to U.S. RFA, at IRSADMIN000067). Defendant was sentenced to eighteen months in prison, (Miner Criminal J. at 2), with a scheduled released date of July 18, 2014, (Wong Decl., Doc. 58-59, ¶ 4).[3]

---

[3] Defendant appealed his conviction and asserts that this Court cannot rely on the conviction because "said criminal conviction is about to be overturned by the Sixth [Circuit] Court of Appeals." However, this Court is not relying on the fact of Defendant's conviction. Instead, this Court is considering testimony elicited during the course of Defendant's criminal trial. The only pertinent issue raised on appeal by Defendant involves testimony elicited at trial from Agent Susanne Lee purported by Defendant to be opinion and hearsay testimony. This Court is not relying on any of the challenged testimony. The other issues on appeal are irrelevant to the matter before this Court. (*See* Defendant's Appellate Brief, Doc. 65-1).

In anticipation of Defendant's approaching release date, the United States seeks protection in the form of a permanent injunction pursuant to 26 U.S.C. §§ 7402 and 7408, prohibiting Defendant from directly or indirectly promoting or selling plans or arrangements that encourage others to attempt to violate the internal revenue laws, among other conduct.

## II.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251–52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is

clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

### III.   ANALYSIS

Pursuant to 26 U.S.C. § 7402, district courts have jurisdiction to grant injunctive relief "as may be necessary or appropriate for the enforcement of the internal revenue laws." Section 7408 expounds upon this jurisdiction and provides that injunctive relief is proper where a defendant engaged in "specified conduct" and where the court determines "that injunctive relief is appropriate to prevent recurrence of such conduct." *Id.* § 7408(b). "Specified conduct" includes any action, or failure to take action, which is . . . subject to penalty under [26 U.S.C. §§ 6700, 6701, 6707, or 6708]." *Id.* § 7408(c). The United States asserts that Defendant violated both § 6700 and § 6701. Notwithstanding his summary denial, it is clear that Defendant's actions violated § 6700.[4]

Section 6700, titled "Promoting abusive tax shelters, etc.," imposes a penalty on any person who, among other things:

> organizes (or assists in the organization of) . . . any investment plan or arrangement . . . and . . . makes or furnishes or causes another person to make or furnish (in connection with such organization[)] . . . a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of . . . participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter.

*Id.* at §6700(a). Notably, § 6700 contains a "knew or had reason to know" scienter requirement. This requirement "is satisfied if the defendant had reason to know his statements were false or fraudulent, regardless of what he actually knew or believed." *United States v. Hartshorn*, 751 F.3d

---

[4] Based on the Court's determination that Defendant's actions violated § 6700, it does not need to address whether the same actions violated § 6701.

1194, 1202 (10th Cir. 2014) (citing 26 U.S.C. § 6700(a)(2)(A); *United States v. Estate Pres. Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000)). Furthermore, "a court may infer the knowledge a reasonable person in the defendant's position would have discovered, and may impute to the defendant knowledge 'commensurate with the level of comprehension required by the speaker's role in the transaction.'" *United States v. Pinnacle Quest Int'l*, No. 3:08–cv–00136–RV–EMT, 2008 WL 2096381, at *6 (N.D. Fla. May 15, 2008) (quoting *United States v. Campbell*, 897 F.2d 1317, 1321–22 (5th Cir. 1990) and citing *Estate Pres. Servs.*, 202 F.3d at 1103).

Defendant, appearing *pro se*, asserts that the IMF program and the UBTO program were lawful activities. Defendant additionally argues that, even if said programs were unlawful, the requisite scienter requirement is lacking.[5]

### A.    Violation of Section 6700

Defendant's conduct in connection with his programs is subject to penalty under § 6700. Specifically, (1) the programs constitute "plans or arrangements," which Defendant organized and sold; (2) Defendant made false or fraudulent statements concerning the tax benefits to be derived from the programs; (3) Defendant knew or had reason to know that the statements were false or fraudulent; and (4) the false or fraudulent statements pertained to a material matter.

Under the plain meaning of the statute, both programs constitute "plans or arrangements." *See United States v. Ratfield*, No. 01–8816–CIV–MARRA, 2004 WL 3174420, at *13 (S.D. Fla.

---

[5] Defendant also suggests that the United States' Motion for Summary Judgment is untimely pursuant to Federal Rule of Civil Procedure 56(b), which provides that "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." However, as acknowledged by Defendant, the summary judgment deadline set forth in Rule 56 is qualified by the language "[u]nless a different time is set by local rule or the court orders otherwise." Fed. R. Civ. P. 56(b). This Court's Case Management and Scheduling Order set a July 1, 2014 deadline for dispositive motions. (Doc. 55 at 1). The United States filed its Motion for Summary Judgment on June 3, 2014, well before the Court's deadline. (Mot. Summ. J. at 5).

Nov. 30, 2004); *United States v. Standring*, No. 1:04CV730, 2006 WL 689116, at *5–6, 9 (S.D. Ohio Mar. 15, 2006). Additionally, Defendant organized and sold these "plans or arrangements." Defendant was the mastermind behind the programs; he wrote and disseminated publications, including *Tax Answers*, explaining the frivolous position that served as the basis of the programs; he provided clients with instructional guides on how to open bank accounts without a social security number in order to evade the IRS; he drafted correspondence on behalf of clients to the IRS; and he advised clients that participating in one or both of his programs would relieve them from tax liability. Moreover, clients paid Defendant, either directly or through one of his unincorporated entities, between $1,200 and $1,800 for the IMF program and approximately $2,000 for the UBTO program.

As to the issue of whether Defendant made false or fraudulent statements, Defendant's primary argument is that his statements were not false because his programs are legally sound. Notwithstanding his protestations to the contrary, Defendant's programs are without legal merit. The very foundation of the IMF program—the concept that individuals are not required to pay taxes on income—is patently frivolous. Even the most cursory review of the Internal Revenue Code and applicable caselaw reveals that Defendant's position is untenable. *See, e.g.*, 26 U.S.C. § 6012(a) ("Returns with respect to income taxes under subtitle A shall be made by . . . [e]very individual having for the taxable year gross income which equals or exceeds the exemption amount."); *Martin v. Comm'r*, 756 F.2d 38, 40 (6th Cir. 1985) (finding argument that appellant was not a "taxpayer within the meaning of the tax laws" "baseless" and citing United States Supreme Court caselaw).

Defendant's UBTOs are based on similarly unsound principles. Again, Defendant advised clients that they could transfer personal assets into the trust, maintain full access to those personal

assets, and yet pay no taxes on those assets. Defendant also claimed that clients could have their income paid directly to the trust to avoid paying income taxes. This type of trust has been repeatedly classified as an illegal "sham" trust. *See, e.g.*, *O'Donnell v. Comm'r of Internal Revenue Serv.*, 726 F.2d 679, 681 (11th Cir. 1984); *Neely v. United States*, 775 F.2d 1092, 1094–95 (9th Cir. 1985); *Holman v. United States*, 728 F.2d 462, 464 (10th Cir. 1984); *Schulz v. Comm'r*, 686 F.2d 490, 493–97 (7th Cir. 1982); *Vnuk v. Comm'r*, 621 F.2d 1318, 1320–21 (8th Cir. 1980). Furthermore, these trusts resemble a grantor trust under 26 U.S.C. §§ 671–677, which is ignored for the purposes of the Internal Revenue Code; its income is taxed to the owner of the trust as the individual's income. 26 U.S.C. § 671; *see also Schulz*, 686 F.2d at 494–95 ("The main thrust of the grantor trust provisions is that the trust will be ignored, and the grantor treated as the appropriate taxpayer, whenever the grantor has substantially unfettered powers of disposition.").

Accordingly, Defendant's statements regarding the tax benefits of his programs were false and fraudulent. For example, in his publications Defendant informed clients, "There is no section of the Internal Revenue Code or its enabling regulations that requires . . . an individual American NOT involved in a revenue-taxable activity[] to file a Form 1040 or pay income taxes" and "you fix the IMF and the IRS goes away." He also led clients to believe that if they corrected the inaccuracies in their IMFs they would "drop off the [IRS's] radar" or become "invisible to the IRS" and no longer be required to file income tax returns or pay income taxes. In reference to the UBTOs, Defendant falsely advised his clients that the UBTOs relieved them of the responsibility of paying taxes or even filing a tax return on the income and assets placed in the UBTO.

These false statements pertained to the issue of whether one is required to file federal income tax returns and pay federal income taxes on one's wages and earnings. Without question, these statements pertained to a material matter "with respect to . . . the excludability of any income,

or the securing of any other tax benefit" as required by 26 U.S.C. § 6700(a)(2)(A); *see also Campbell*, 897 F.2d at 1320 ("At least two types of statements fall within [§ 6700's] statutory bar: statements directly addressing the availability of tax benefits and those concerning factual matters that are relevant to the availability of tax benefits.").

As to the scienter requirement, Defendant knew or had reason to know that his statements were false or fraudulent. The record evidence indicates that Defendant had actual knowledge that at least some of his statements were false. By Defendant's own admission, he spent hundreds of hours researching tax law then created programs that, as previously discussed, were patently unlawful. Additionally, several of the primary resources recommended by Defendant were founded or written by individuals who had been criminally convicted and civilly enjoined for engaging in similar fraudulent programs. Contrary to Defendant's argument, it is irrelevant whether Defendant "fully endorsed" these references. The fact that they are listed as references indicates that Defendant was fully aware of them, their businesses, and their ideologies. It follows, therefore, that Defendant would have been aware of the convictions and injunctions.

Indeed, one of these individuals was Joseph Sweet, a business associate of Defendant's with whom Defendant maintained contact. The ideologies promoted by Mr. Sweet prompted Defendant to develop the IMF and UBTO programs and at one point, the two planned a joint venture because their beliefs were so similar. In 2002, the year Defendant began his IMF program, Mr. Sweet was permanently enjoined from "[o]rganizing, promoting, marketing, or selling the tax shelter, plan, or arrangement entitled 'GOOD NEWS for FORM 1040 Filers: Your Compliance is Strictly VOLUNTARY! BAD NEWS for the IRS!'"—the same reference provided in Defendant's publication. (Order of Permanent Inj. against Sweet at 2). At the same time, Mr. Sweet was permanently enjoined from "[o]rganizing, promoting, marketing, or selling 'Unincorporated

Business Trust Organizations.'" (*Id.* at 3). Moreover, the Permanent Injunction required Mr. Sweet to "provide a copy of [the permanent injunction Order] to all individuals and entities who previously purchased" Mr. Sweet's book. (*Id.*). Mr. Sweet was later criminally convicted for his actions in connection with the same activities. It is implausible that Defendant was not aware of the civil injunction and Mr. Sweet's criminal conviction.

Nevertheless, assuming arguendo that Defendant had no actual knowledge of Mr. Sweet's and other third party injunctions and convictions, a reasonable person in Defendant's position would have certainly discovered such information. In fact, a reasonable person in Defendant's position would have discovered that all of his relevant statements were false. Defendant is an educated individual who spent hundreds of hours in law libraries reading statutes, regulations, and caselaw. As stated previously, the law is clear on these matters; the bases of Defendant's programs are legally untenable. Therefore, regardless of his actual knowledge, Defendant "had reason to know" that his statements were false. Furthermore, Defendant held himself out as a tax expert and advised clients on tax liability. Thus, the level of comprehension required by one serving in the role of a tax expert, and the knowledge possessed by such an expert—namely that Defendant's statements were false—may be imputed to Defendant. *Pinnacle Quest Int'l*, 2008 WL 2096381 at *6.

Accordingly, Defendant's actions in connection with both the IMF program and the UBTO program violate § 6700.

### B.    Injunctive Relief

In addition to determining that Defendant's conduct violated § 6700, the Court must also decide whether "injunctive relief is appropriate to prevent recurrence of such conduct." 26 U.S.C. § 7408(b). Injunctive relief is appropriate in this case.

A court may consider the following factors when determining the likelihood of a future § 6700 violation and whether an injunction is appropriate:

> (1) gravity of the harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or nonrecognition) of his own culpability; and (6) the likelihood that defendant's occupation would place him in a position where future violations could be anticipated.

*Estate Pres. Servs.*, 202 F.3d at 1105. Each of these factors weighs in favor of granting injunctive relief.

Defendant caused serious harm to both the United States and his clients. Due to Defendant's actions, many of his clients have been investigated by the IRS and subsequently paid more in taxes and penalties than would have otherwise been required. At least one client was criminally convicted for actions he took based on Defendant's advice. As articulated by one of Defendant's clients, Mr. Puelo, "This man is ruining people's lives by doing this." (Crim. Tr. at 818:20–21). Additionally, Defendant caused irreparable harm to the United States. Not only have Defendant's schemes denied the United States tax revenue, but the schemes have also caused the IRS to expend resources responding to the voluminous and frivolous FOIA requests, addressing correspondence drafted by Defendant, and investigating both Defendant and his clients.

As to Defendant's level of participation, it is difficult to fathom how Defendant could have been more involved. Defendant developed the programs, created the business model, advertised his services, published articles on the programs, drafted documents for clients, and personally advised clients on the purported tax benefits of his programs. Even after Defendant's business grew to the point of hiring associates to perform some of the hands-on work, Defendant personally trained those associates.

As the previous scienter discussion indicates, Defendant's assertion that he lacked actual knowledge that his programs were illegal cannot be reconciled with the record evidence. If Defendant lacked actual knowledge, only an active disregard for clearly evident facts could allow Defendant to claim ignorance.

Furthermore, Defendant's infractions were not isolated occurrences. He maintained a full-fledged operation for more than a decade. Defendant began selling *Tax Answers* as early as 1995 and began decoding IMFs for others as early as 2002. He trained and supervised at least six associates, maintained a website marketing his services, and claimed to have "helped" two thousand clients.

As unfavorable as the remaining factors are to Defendant, the two factors most indicative of the need for injunctive relief is Defendant's nonrecognition of his culpability and the likelihood that he will engage in the same or similar behavior in the future. In his Response to the United States' Motion for Summary Judgment, Defendant persists in arguing that his programs were lawful. Defendant even accuses the United States of misleading the Court into falsely believing that his UBTO program is illegal because the IRS does not want the public to discover the benefits of such trusts. Based on this argument, Defendant opposes any restriction on his ability to "teach about," "create," or "support" UBTOs. This argument indicates that Defendant has every intention of continuing his tax-evasion business.

In addition to the § 7408-specific factors, the traditional, common-law factors for granting injunctive relief also weigh in favor of doing so. Under those factors, the moving party must show: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage

the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

As the analysis contained herein explains, the United States has succeeded on the merits of its claim. Additionally, because Defendant's statements indicate that he intends to continue his schemes, irreparable injury would result to both the United States and the public absent an injunction. Conversely, there is no cognizable injury to Defendant. Injunctive relief in this case will simply forbid Defendant from participating in unlawful behavior and provide the United States a vehicle by which it may rectify previous and avoid future harm to itself and the public. Finally, the injunction favors the public interest. The number of individuals directly affected by Defendant's unlawful schemes range from 175 to 2000. If Defendant goes forth unchecked, many more will likely be injured.

### C.    Terms of the Injunction

Along with enjoining Defendant from engaging in future actions that would violate the Internal Revenue Code, the United States requests that the injunction provide the following additional relief: (1) require Defendant to provide a list of his customers' identities and contact information to the United States; (2) notify his customers of the injunction; and (3) post the injunction on any websites through which Defendant advertises services related to federal taxes.

As the Seventh Circuit has noted in a similar case, "[r]eliance on [Defendant's] materials has and will continue to irreparably harm [Defendant's] customers, who have exposed themselves to increased tax and criminal liability." *United States v. Benson*, 561 F.3d 718, 727 (7th Cir. 2009). Notifying current and prospective clients will mitigate that harm. Additionally, Defendant's actions will continue to irreparably harm the United States, "which is 'not receiving required tax payments and [is] forced to expend resources to [identify and] collect the unpaid taxes." *Id.*

(quoting *United States v. Schulz*, 517 F.3d 606, 607–08 (2d Cir. 2008)). "Without a customer list, it is unlikely that the government will identify each of [Defendant's] customers who followed his advice before the statute of limitations has run." *Id.* Furthermore, "[r]equiring [Defendant] to provide the identity and contact information of the recipients of the tax materials enables the government to monitor whether the recipients of [Defendant's] materials are violating the tax laws." *Schulz*, 517 F.3d at 608. Accordingly, requiring Defendant to notify his clients, both directly and by posting the injunction on his website, and to provide the United States with a full client list, including contact information, is appropriate. *See Pinnacle Quest Int'l*, 2008 WL 2096381, at *7–8 (requiring the defendant to provide a copy of preliminary injunction to present and former customers and vendors and to post a copy on its websites); *United States v. Bosset*, No. 8:01–CV–2154–T–17TBM, 2003 WL 1735481, at *3–4 (M.D. Fla. Feb. 27, 2003) (requiring the defendant to contact "all persons to whom [he] gave, sold, or distributed any materials espousing" his false tax advice and inform them that his position was incorrect); *United States v. Rosile*, No. 8:02–CV–466–T–17MSS, 2002 WL 1760861, at *3 (M.D. Fla. June 10, 2002) (requiring the defendant to provide a complete list of his customers, including names, addresses, phone numbers and social security numbers or employer identification numbers, to the United States)

## IV.   CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. The United States' Motion for Summary Judgment (Doc. 56) is **GRANTED**.

2. Pursuant to 26 U.S.C. §§ 7402 and 7408, David Lee Miner is hereby permanently enjoined from directly or indirectly:

   a. Advocating, marketing, or promoting in any manner, including but not limited to through websites or other promotional materials, the false and

frivolous positions that individuals can evade liability from federal income tax, understate their liability for federal income tax, or avoid filing federal tax returns by changing the Individual Master File ("IMF") or other records maintained by the Internal Revenue Service ("IRS");

b.  Preparing or assisting or advising with respect to the preparation of documents purporting to "decode" records maintained by the IRS, including the IMF;

c.  Advocating, marketing, or promoting in any manner, including but not limited to through websites or other promotional materials, the false and frivolous positions that individuals can use "Unincorporated Business Trust Organizations," "business trusts," "pure trusts," "Massachusetts trusts," or similar entities to evade liability from federal income tax, understate their liability for federal income tax, or avoid filing federal tax returns;

d.  Providing forms for or otherwise assisting with the creation of "Unincorporated Business Trust Organizations," "business trusts," "pure trusts," "Massachusetts trusts," or similar entities;

e.  Advising others that they are not required to file federal tax returns or pay federal taxes;

f.  Organizing, promoting, marketing, selling, or advising with respect to any plan or arrangement that Miner knows or has reason to know violates or attempts to violate the Internal Revenue Code or assists others in unlawfully evading the assessment or collection of their correct federal tax liabilities,

including plans or arrangements based on the false and frivolous position that "wages are not taxable under the Internal Revenue Code";

g. Making false statements in connection with the organization, promotion or sale of a plan or arrangement about the allowability of any deduction or credit, the excludability of any income, or the securing of any tax benefit by reason of participating in any such plan or arrangement;

h. Organizing, promoting, marketing, selling, or advising with respect to any plan or arrangement that advises or assists others in interfering with the proper administration of the Internal Revenue Code;

3. Pursuant to 26 U.S.C. § 7402, Defendant David Lee Miner shall identify and collect the names, addresses, e-mail addresses, telephone numbers, and Social Security or other tax identification numbers of all persons who have purchased from him or through any of his entities (including but not limited to IRx Solutions and Blue Ridge Group) any products, services, or advice associated with the IMF program and the Business Trust program, as described in this Order;

4. Pursuant to 26 U.S.C. § 7402, Defendant David Lee Miner shall produce to counsel for the United States all the information collected in paragraph 3 on or before Friday, December 19, 2014;

5. Pursuant to 26 U.S.C. § 7402, Defendant David Lee Miner shall send by mail a copy of this Order to each individual identified in paragraph 3 on or before Friday, December 19, 2014;

6. Pursuant to 26 U.S.C. § 7402, Defendant David Lee Miner shall post a copy of this Order on www.irx-solutions.com and any other website on which he, or any entity

controlled by him, advertises services related to federal taxes on or before Friday, December 19, 2014;

7. Pursuant to 26 U.S.C. § 7402, Defendant David Lee Miner shall exercise reasonable diligence in obtaining the information identified in paragraph 3 to the extent that any such information is not in his possession, custody, or control;

8. Pursuant to 26 U.S.C. § 7402, Defendant David Lee Miner shall file with the Court a certification signed under penalty of perjury that he has complied with paragraphs 3, 4, 5, and 6 on or before Monday, January 5, 2015;

9. The United States may conduct post-judgment discovery to monitor Defendant's compliance with this Order;

10. This Court shall retain jurisdiction over this action for the purpose of enforcing this Order.

11. The Clerk is directed to close this case.

**DONE** and **ORDERED** in Orlando, Florida on November 19, 2014.


_CARLOS E. MENDOZA_
UNITED STATES DISTRICT JUDGE


Copies furnished to:

Counsel of Record
Unrepresented Parties